GLORIA FAY SHAW (MORROW) *v.* HOMER KELLO SHAW

5-5426                                          462 S. W. 2d 222

Opinion delivered January 25, 1971

*Omar Greene* and *Thorp Thomas*, for appellant.

*Jack Yates*, for appellee.

CARLETON HARRIS, Chief Justice. This appeal involves the custody of James Kello Shaw, five year old son of Gloria Fay Shaw (Morrow), appellant herein, and Homer Kello Shaw, appellee. Mr. Shaw was granted a divorce from Mrs. Shaw on January 15, 1968, and the custody of James Kello was awarded to both parents, each to have the custody and control for six months of the year until the child became of school age. Appellee was directed to pay the sum of $15.00 per week as child support during each whole or partial week in which the child was in the custody of Mrs. Shaw. In September, 1969, Mr. Shaw filed a motion to modify the decree, asserting that his ex-wife refused to permit him to talk with his child by telephone or otherwise contact him during the time she had custody; that appellant's husband, James Morrow, had attacked him at a time when he was trying to see the child; that it would be to the best interest of the child for

appellee to be given complete custody. Mrs. Morrow answered, denying the allegation and asking that full time custody be given to her. On trial, after hearing a number of witnesses, the court found that Mr. Shaw had been deprived of freedom of contact with the child; that continued controversy arose between the parties, including personal difficulties of violence with appellant's present husband, all occurring in the presence of the child. The court further found by the testimony "that the environment, as well as the activities of this defendant, are not conducive to being in the best interest of the minor child. Further, the defendant lives in an apartment complex and is employed, having to leave the minor child in a kindergarten or with other persons. On the other hand, the plaintiff has other minor children in his home which is near to the home of his parents where the minor child of the parties has resided for a portion of his lifetime, and this is in a rural community with an environment of churches, family life, and wholesome farm life, and all of which lends itself for better growth and development of minor child concerned. In addition, the plaintiff's present wife did not work when the minor child lived with the plaintiff prior to this hearing and would not work if the child were again in their home, so that this child would have a normal home family life at all times."

Custody was accordingly placed with the father, subject to the right of reasonable visitation to the mother at all reasonable times, including one weekend per month from Friday afternoon at 5:00 p.m. until Sunday afternoon at 5:00 p.m., and for a period of two weeks during the first half of the summer months and two weeks during the second half of the summer months. From the decree entered in accordance with these findings, appellant brings this appeal. Several points are asserted for reversal but all except one relate to the court's findings, previously set out, which the appellant contends were erroneous. The additional point relates to a purported report of the welfare department, this matter arising because of a statement by the court at the conclusion of the testimony and

before the final decision, "I'm going to have the child welfare department investigate the homes of everyone concerned". Appellant says that this report was not a part of the record, not submitted to the appellant, and that she had no opportunity to refute or introduce testimony, if same should be deemed necessary.

We see no need to detail the evidence offered by the parties. Mr. Shaw, an employee of Arkansas Louisiana Gas Company, stated that his wife and her husband had an unlisted telephone number at their residence, which prevented him from talking with his son over the telephone; that his ex-wife had given him her office telephone number and that at times he talked with the boy there; that apparently James Kello was frequently taken to the office; that on one occasion, when he took the child to appellant's home to turn him over for the six months she was to have custody, Mr. Morrow accused him of not paying child support, of calling Mrs. Morrow "bad names", and appellee said that he was given a physical beating by Morrow. Shaw stated that it was necessary that he go to a doctor after the physical altercation. Shaw further testified that his ex-wife used vile language in the presence of the child, and cursed him (appellee) in the boy's presence. On the other hand, Mrs. Morrow testified that she obtained the unlisted number because her ex-husband, or some member of his family, had been calling the child at all hours of the night, and that Shaw would curse her and call her vile names over the telephone; that after conversations with his father, James Kello would be highly upset. She said that her husband had told Shaw that he was going to have to stop calling her foul names, and that on the occasion of the fight, appellee had "invited" Morrow out into the yard where the fight took place. Appellant complained that on several occasions appellee would not let her visit with the child when she went there to see him, and each parent stated that the child did not want to stay with the other.

Some facts seem to be definitely established. Shaw has also remarried and his present wife has a child by

a previous marriage, and the Shaws also have a child of their own. Mr. Shaw's parents live about half a mile from their son and his wife, and she (the elderly Mrs. Shaw) has kept the children when the two were working. Mrs. Homer Shaw stated that she had worked during the period when her husband did not have custody of James Kello, as a matter of helping him meet the support payments, but she did not work when he had custody of the boy, and would quit her job if he were given the absolute custody. Reverend John Holt, pastor of the church attended by the Shaws, testified that appellee was very active in his church, and regularly attended with his wife and children.

Mrs. Morrow and her husband have an apartment in Little Rock, where they are employed by Life and Time, Inc., Family Publication Service. Mr. Morrow is sales manager of Arkansas and Mrs. Morrow is employed as secretary and assistant manager. During the time when the Morrows had custody of James Kello, he was left at a nursery while they were at work. Admittedly, appellant fell in love with Morrow while she was still married to Shaw, having met Morrow while in school at Arkansas Vo-Tech, appellant being enrolled for a course in cosmetology at the time. Admittedly, she knew that Morrow was also married and the father of two children. After becoming divorced, appellant lived with Morrow in Little Rock as husband and wife for a month or two before marriage.. Her stated reason was "because I loved him, and at the time he wasn't able to obtain his divorce and we did move in together and lived together". In fact, Mr. and Mrs. Roe Neal, the couple who "stood-up" with them when they were married, both testified that previous to the marriage they thought appellant and Mr. Morrow were already married, Mrs. Neal stating that they already lived at the same address, and went by the name of Mr. and Mrs. Morrow at work and "every place". Appellant used Mrs. Neal's rings when she was married.

Mr. Neal also testified that on one occasion, Mrs. Morrow (before her marriage) called his wife and said

that her husband was leaving to go out to a club, "he was going drinking that night" and wanted to know if Mrs. Neal could visit with her. He took his wife to the Morrow Home and his wife went upstairs, but returned screaming that appellant was hollering "I'm going to kill myself"; appellant had a "bunch of pills, and she was hollering that if Jim didn't love her—if she couldn't have him, nobody else could get him, and she was going to take those pills". He said that he finally got the pills away from her. Mrs. Morrow denied any intent to commit suicide, stating "Well, during this time I was away from my child and wasn't getting to see him. When I did call and talk to him I was being harrassed and everything, and my nerves were upset. I was taking a light sedative".

Be that as it may, we certainly cannot agree that the chancellor's findings were incorrect. This is not to say that one cannot do wrong, and later change for the better. We do think however that this evidence was pertinent to the custody issue, inasmuch as the events mentioned occurred only about eighteen months before the custody hearing. Entirely aside from that however, it would appear that the child would be in more suitable surroundings with his father. There, according to the evidence, he would be looked after during the day by appellee's second wife, it being remembered also that his grandparents live in close proximity to the Shaw home. Also, he would be living with the two children heretofore mentioned. Mrs. Morrow herself testified that "Mr. Shaw is a good daddy to his child". She said that he worked and provided for James Kello and was good to him. Her only criticism was "He didn't give the child the time that I thought he should have". It definitely appears from the evidence that the welfare of the child would be best served with the custody in the father.

Nor can we agree that appellant's second point contains merit. It is true that we will attach no weight to undisclosed information that rests only in the breast of the trial judge, *Grumlin* v. *Gray*, 246 Ark., 635, 439

S. W. 2d 290. However, that case is not applicable here. In the first place, there is nothing in the record to indicate that any investigation was ever made, or report submitted to the court, and it may well be that the chancellor did not follow through on his statement mentioned at the outset of this opinion. But there is a more important reason why the point is without merit, the same reason set forth in the case of *Nance* v. *Nance*, 226 Ark. 682, 292 S. W. 2d 74. A like objection was made there also, but after reviewing the evidence, this court said:

"But in the case at bar we find it unnecessary to make any ruling concerning Act 184 of 1955 or the reports in this case, because this Court holds that the decree of the Chancery Court is correct in all matters, even entirely excluding the said reports."

Here too, after reviewing the record, we hold that the order placing custody in appellee was entirely correct.

Affirmed.